UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Duane R. Shock,                                              Case No. 3:21-cv-2404

          Plaintiff,

   v.                                                           MEMORANDUM OPINION
                                                                    AND ORDER

Webster Industries, Inc.,

          Defendant.

## I. INTRODUCTION

Defendant Webster Industries, Inc. has filed a motion for summary judgment. (Doc. No. 21). Plaintiff Duane R. Shock filed a brief in opposition, (Doc. No. 24), and Webster filed a brief in reply. (Doc. No. 26). For the reasons that follow, I grant Webster's motion.

## II. BACKGROUND

### A. SHOCK'S DISABILITY AND EMPLOYMENT HISTORY

Duane Shock has been completely deaf since he was less than a year old. (Doc. No. 22-1 at 18-19). He prefers to communicate through American Sign Language ("ASL"). (*See* Doc. No. 23-1 at 106). Shock can read and write English well enough to communicate with others, though he does not always feel comfortable doing so. (*See id.*; Doc. No. 22-1 at 10-11). In addition, he can read lips only for "simple things" like "drink" or "water." (Doc. No. 22-1 at 11). When communicating in-person with someone who does not know ASL, Shock relies primarily on handwritten notes supplemented by physical gestures and body language cues. (*See id.* at 10-11).

In 1999, Webster, a manufacturer of industrial chains, hired Shock to work as a machine parts operator. (*Id.* at 9, 13-14); (*see* Doc. No. 21-1 at 8). Shock is a member of the International Association of Machinists & Aerospace Workers ("IAMAW"), and he, like the other union members working at Webster, is subject to the collective bargaining agreement between Webster and IAMAW. (*See* Doc. No. 22-1 at 43; Doc. No. 22-7). After he was hired, Shock requested, and Webster provided, an ASL interpreter for trainings and certain work-related meetings. (Doc. No. 22-1 at 10-11, 20; *see, e.g.*, Doc. No. 22-3). Because interpreters in the area were scarce, Webster had to schedule them up to ten days in advance. (*See* Doc. No. 21-14 at 2). In addition, after Shock lobbied for Webster to include closed captioning on its video message boards—including by filing complaints with his union and with Webster's human resources department—Webster implemented that change in 2018. (*See* Doc. No. 22-1 at 12, 18).

Webster did not provide an interpreter for Shock's day-to-day work tasks. (*Id.* at 11). So, because of Shock's limited lip-reading abilities, and because most of his colleagues did not know sign language, Shock communicated with them primarily through handwritten notes and gestures. (*Id.* at 11-12, 21). Shock testified that this method of communicating, combined with Webster's occasional provision of an interpreter, was "successful" in allowing him to perform "the essential functions of [his] job" for 21 years. (*Id.* at 15). Shock's former supervisor, Stephen Reis, agreed Shock was a skilled and experienced machinist. (*See* Doc. No. 23-1 at 15, 51; Doc. No. 24-2).

But Shock had "anger issues." (Doc. No. 23-1 at 15). Reis described two of Shock's outbursts by way of example. Once, when Reis assigned him to work two weekends in a row, Shock yelled and pointed at him through his office door. (*See id.*). On another, when Reis attempted to bring Shock to speak with a human resources manager, Shock "gestured at [him] to bring it on"— that is, he indicated he "wanted to fight" Reis. (*Id.* at 16). Reis also testified Shock flipped off other workers "quite often," Doc. No. 23-1 at 22, and that he frequently "interfere[d] with a lot of

people's work in the machine shop." (*Id.* at 35). Deborah Scheiber, the Director of Human Resources at Webster, testified Shock was "frequently angry" at work in an uncontrolled and disruptive manner. (*Id.* at 62). She estimated she dealt with Shock's disruptive behavior on a "monthly" basis. (*Id.* at 63).

Webster sometimes disciplined Shock for his behavior. In 2008, Webster gave Shock a written warning for insubordination to his supervisor. (*See* Doc. No. 22-10 at 1). In 2015 or 2016, Webster reprimanded Shock for his repeated use of the middle finger gesture. (*See* Doc. No. 22-1 at 58). In October of 2017, Wayne Burns, another supervisor, caught Shock smoking behind a group of furnaces. (*See* Doc. No. 21-6 at 2). When asked to put out the cigarette, Shock continued to smoke, then threw a newspaper he was holding on the ground, refused to come with Burns to the human resources department, gestured at Burns, and walked away. (*See id.*). Shock was issued a written warning for violating Webster's smoking and tobacco policy and for violating Webster's policy prohibiting "using obscene or abusive language." (*Id.*).

In 2018, Webster formally disciplined Shock again after several disruptive incidents in a single week. On June 6, 2018, Shock became angry and yelled "bull shit" after being asked to train a newer employee on one of the machines. (Doc. No. 21-7 at 2). On June 7, 2018, after he noticed that a machine was calibrated to a setting he did not like, Shock became angry and threw a clipboard across the working area. (*See* Doc. No. 23-1 at 25, 73; Doc. No. 21-8 at 2). On June 8, 2018, Shock confronted Christian Young, a coworker who may have told a supervisor about the previous day's incident. (*See* Doc. No. 21-7 at 2, Doc. No. 21-8 at 3). Shock yelled at Young, waved his middle finger at him, and accused him of stabbing him in the back. (*See id.*). Then, Shock threatened to punch Young and "blacken his eye." (*See* Doc. No. 21-7 at 2; Doc. No. 23-1 at 24-26).

On June 11, 2018, Webster suspended Shock for five days, required him to complete a course of anger management therapy, and sent him a written reprimand with a "last chance

warning" stating Webster would terminate his employment for another similar "infraction or incident." (Doc. No. 21-9). Two days later, after Shock filed a grievance through the IAMAW, his suspension was reduced from five days to three, and the "last chance verbiage" was "remov[ed]." (Doc. No. 24-5). Shock successfully completed his anger management therapy. (*See* Doc. No. 24-1 at 8; Doc. No. 24-2 at 2).

Shock attributed at least some of his anger to communication and cultural barriers between him and his non-deaf colleagues. For example, he believed that his colleagues perceived some of his gestures and mannerisms as aggressive, when in fact they were benign. (*See* Doc. No. 24-1 at 9). He also expressed frustration at his coworkers' perceived lack of curiosity about deaf culture and American Sign Language. (*See id.* at 10). And in June of 2020, a few months before his termination, Shock complained to Nick Spurck, Webster's Vice President of Operations, about a coworker who sent Shock notes that "disrespected and discriminated against" him because of his deafness. (*See* Doc. No. 24-4 at 2; Doc. No. 23-1 at 82-83).

But Shock also acknowledged progress in some of these areas. Webster held a seminar for supervisors and the Human Resources department about deaf culture, and some of his coworkers started to learn American Sign Language after he asked them to do so. (*See* Doc. No. 24-1 at 9-10). In addition, after Shock's June 2020 complaint, Spurck met with Reis and Jeff Pifher, an Operations Manager at the Webster plant, and asked them to "go above and beyond to keep [Shock] in the loop regarding information" and to be cognizant of Shock's "anxiety," derived from his inability to hear, "that others are talking about him or making fun of him." (Doc. No. 24-4 at 4).

**B.    SHOCK'S TERMINATION AND SUBSEQUENT EVENTS**

In the summer of 2020, during the height of the first wave of the COVID-19 pandemic, Shock and Gerry Goshe, a fellow machine operator, came into conflict.[1] On August 13 of that year, Goshe asked Shock a question about something Shock was doing with a toolbox, and Shock refused to answer. (*See* Doc. No. 22-17). The next day, at around 10:00am, Shock turned off Goshe's machine when Goshe stepped away from it. (*See id.*; Doc. No. 23-1 at 94). Frustrated that Shock entered his workspace without his permission, Goshe wrote a message telling Shock to "mind your own business" on a manila envelope and shoved it in Shock's face. (Doc. No. 23-7; Doc. No. 22-8 at 2; Doc. No. 23-1 at 98). Shock grabbed the envelope from Goshe. (Doc. No. 22-8 at 2; Doc. No. 23-1 at 98). Goshe spit in Shock's face, then Shock spit back. (*See* Doc. No. 22-8; Doc. No. 22-1 at 28; Doc. No. 21-13 at 4; Doc. No. 23-1 at 98). Goshe stepped forward and pushed Shock, and Shock pushed back. (*See* Doc. No. 22-8 at 2; Doc. No. 22-1 at 76; Doc. No. 23-1 at 98). Shock then balled his hands into fists, and Goshe left the work area. (Doc. No. 22-8 at 2; Doc. No. 22-1 at 53).

Pifher, Reis, and Kevin Koch, a group leader, investigated the incident. (*See* Doc. No. 24-3 at 4-6). Pifher separately interviewed Goshe and Shock about what happened. (*See* Doc. No 23-1 at 31-34; Doc. No. 24-3 at 4). During Pifher's conversation with Shock, the two communicated using the same combination of writing and hand gestures Shock used to communicate with his coworkers on a daily basis. (*See* Doc. No. 23-1 at 31-32; Doc. No. 22-1 at 76-79; Doc. No. 22-17). Shock told

---

[1] Shock articulated his perspective on the incident with Goshe in three places: first, in an August 20, 2020 written statement, second in his testimony during the arbitration proceeding described below, and third during his deposition taken for this lawsuit. (*See* Doc. No. 22-8; Doc. No. 22-1 at 45-60; Doc. No. 23-1 at 105-108). Shock testified that the version of events in the August 20, 2020 written statement was an accurate reflection of his knowledge and perspective at the time, except that it referred to him as "hard of hearing" when he is actually "deaf" and misstated the extent to which he could read lips. (Doc. No. 22-1 at 45-46; *see also* Doc. No. 23-1 at 105). So, other than those two details, the August 20, 2020 letter represents Shock's account of the incident with Goshe.

Pifher that he spit on Goshe in retaliation for Goshe spitting on him and that he shoved Goshe after Goshe shoved him. (*See* Doc. No. 22-18; Doc. No. 22-1 at 76-77).

That same day, at around 2:00pm, Reis and Pifher emailed their findings to Scheiber and Spurck. (*See* Doc. Nos. 22-17 & 22-18). Reis, Pifher, and Scheiber then met to discuss the situation. (*See* Doc. No. 23-1 at 43-44 ). The three of them decided to terminate both employees. (*See id.* at 43-45, 78, 83). Reis, who also supervised Goshe, testified: "[t]o me it did not matter who started this. They were both in the wrong" because they had both committed "terminable offenses." (*Id.* at 40).

Shock met with Reis, Pifher, Scheiber, and two union representative, Jesus Holguin and Tyler Robbins, later in the afternoon on August 14, 2020. (*See* Doc. No. 23-1 at 45-46). Upon arriving, Shock was handed a letter terminating his employment, effective that same day. (*See* Doc. No. 24-3 at 2). The letter instructed him to "not . . . enter the plant for any reason" and informed him his benefits would "terminate effective midnight tonight, 8/14/2020." (*See id.*). During the meeting, Shock requested an interpreter. (*See* Doc. No. 22-1 at 54-55; Doc. No. 22-8 at 1; Doc. No. 23-1 at 74, 100-101; Doc. No. 21-13 at 4 (admitting that his request for an interpreter "was made during the termination meeting" on August 14, 2020)). Shock's request was denied, and he left the building. (*See* Doc. No. 22-1 at 55; Doc. No. 23-1 at 75, 95). Goshe was terminated soon thereafter. (*See* Doc. No. 23-1 at 47-48).

After the twin terminations, the IAMAW filed grievances on behalf of both employees. (*See id.* at 47-48, 79; Doc. No. 22-4). Webster denied Shock's grievance on August 19, 2020. (Doc. No. 22-4). But Webster reduced Goshe's termination to a suspension. (*See* Doc. No. 23-1 at 47-48, 79). Scheiber and Reis testified this was because the two had very different disciplinary histories: Goshe did not have prior disciplinary incidents, while Shock had several, along with a history of disruptive and angry behavior. (*See* Doc. No. 23-1 at 47-48, 79-81). Reis, who supervised both employees,

6

testified that Goshe "had never fought on the job before or been disgruntled or angry with other coworkers," that he was "contrite" and "remorseful" after the incident, and that he "did not have prior write-ups that were similar" to Shock's. (*Id.* at 47-48). Similarly, Scheiber, the Human Resources Director, testified that Goshe was "quiet" and that his disciplinary record for fighting and violence was "nonexistent." (*Id.* at 66-67).

Shock and the IAMAW submitted his grievance to arbitration. (*See* Doc. No. 21-14 at 2). The arbitrator, Richard Bales, held a hearing on December 18, 2020, *see* Doc. No. 23-1, and issued the Award on January 18, 2021. (*See* Doc. No. 21-14 at 2). The arbitration addressed the following issues: "Did Webster Industries have just cause to discharge Grievant Duane Shock for the incident that occurred on August 14, 2020? If not, what should the remedy be?" (*Id.* at 4).

Interpreting several sections of the CBA, and making factual findings based on the evidence presented at the hearing, Bales concluded Webster had just cause to fire Shock and to later reinstate Goshe while not reinstating Shock. (*See id.* at 6). Bales also concluded Webster "violated Mr. Shock's industrial due process right" by failing to provide him with an interpreter during his termination meeting. (*Id.*). Even so, Bales found "Webster would have made the same discharge decision, and that it had just cause to do so pursuant to the CBA." (*Id.*). Bales ordered Webster to pay Shock two weeks' wages to reflect the time it could have taken Webster to arrange for an interpreter but ordered no other relief for Shock. (*Id.* at 7).

On March 26, 2021, Shock filed a charge with the EEOC and with the Ohio Civil Rights Commission for retaliation and for discrimination in employment on the basis of disability. (Doc. No. 1-1). Shock received his Notice of Right to Sue on October 5, 2021. (Doc. No. 1-2). On December 26, 2021, he sued Webster, alleging three causes of action: (1) disparate treatment on the basis of his disability under the ADA, (2) failure to accommodate under the ADA, and (3) retaliation under the ADA. (*See* Doc. No. 1 at 3-5).

### III. STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). But "'at the summary judgment stage the judge's function is not

himself to weigh the evidence and determine the truth of the matter.'" *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).  Therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.

The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, I must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### IV.  ANALYSIS

Webster moves for summary judgment on all of Shock's claims.  (Doc. No. 21 at 7).  Shock contends all his claims are viable.  (Doc. No. 24 at 14).

#### A.  ISSUE PRECLUSION

Webster first argues the doctrine of issue preclusion disposes of Shock's claims because the prior arbitration proceeding already determined that Webster fired Shock for "just cause," and not for any discriminatory reason.  (*See* Doc. No. 21 at 15-17).  Shock argues the arbitration award does not preclude any part of any of his claims because "[t]he arbitrator in the arbitration was not empowered to consider Mr. Shock's arguments of pretext or to weigh them in light of discrimination laws," and could only "interpret the collective bargaining agreement."  (Doc. No. 24 at 8).

Issue preclusion, also known as collateral estoppel, generally prevents a party from relitigating a legal or factual issue decided in a prior proceeding.  *See Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015).  Under some circumstances, an un-appealed arbitration award can

9

have preclusive effect on an issue raised in a subsequent federal proceeding. *See, e.g., Central Transp. Inc. v. Four Phase Sys. Inc.*, 936 F.2d 256, 260 (6th Cir. 1991).

But this is not true for a unionized employee who sues in federal court under a federal antidiscrimination law like the ADA. *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 547-49 (6th Cir. 2008). An employee subject to a collective bargaining agreement "is not barred from bringing a subsequent statutory claim against [his] employer based on the same conduct, because arbitration over contractual disputes under a collective bargaining agreement is of a 'distinctly separate nature' than 'independent statutory rights accorded by Congress.'" *Id.* at 547 (quoting *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 49-50 (1974)).

So, when an employee "seeks to vindicate [his] federal rights to be free from discrimination," a court "must review all factual issues—including contractual ones—de novo in order to ensure that 'the interests of the individual employee [are not] subordinated to the collective interests of all employees in the bargaining unit.'" *Nance*, 527 F.3d at 549 (quoting *Alexander*, 415 U.S. at 58 n. 19). As long as such a plaintiff does not waive their right to go to federal court, "a prior arbitration does not preclude [a court] from reconsidering all factual issues underlying a statutory claim." *Nance*, 527 F.3d at 549.

Here, Shock is covered by the CBA because he is a member of the union, and the arbitration unquestionably dealt with the interpretation and application of the CBA. (*See* Doc. No. 21-14 at 6 (finding "Webster would have made the same discharge decision[] and . . . had just cause to do so pursuant to the CBA Article IX Section 1 and Handbook Section 3.1")). And Webster makes no argument Shock ever waived his right to go to federal court. (*See* Doc. No. 21 at 15-17; Doc. No. 26 at 2-3). So even if the arbitrator's award included a finding on a legal or factual issue relevant to this

10

case, Shock is not precluded "from re-litigating that same issue in federal court." *Nance*, 527 F.3d at 548.² I reject Webster's issue preclusion argument.

### B.   DISPARATE TREATMENT CLAIM

The ADA prohibits an employer from discriminating against an employee because of the employee's disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A claim of disability discrimination in employment relying on circumstantial evidence, like the one in this case, is analyzed under the *McDonnell Douglas* burden-shifting framework. *Williams v. AT&T Mobility Servs., LLC*, 847 F.3d 384, 395 (6th Cir. 2017); (*see* Doc. No. 24 at 9 (applying only the *McDonnell Douglas* framework)).

First, a plaintiff must establish a prima facie case of discrimination. *Williams*, 847 F.3d at 395. If the plaintiff does so, "the burden then shifts to the employer to demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (citing *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)). Once the employer makes this showing, "[t]he plaintiff must then show that the reason given by the employer was actually a pretext designed to mask unlawful discrimination." *Williams*, 847 F.3d at 395.

Webster concedes, "[f]or purposes of summary judgment only," that Shock can establish a prima facie case of disability discrimination under the ADA. (Doc. No. 21 at 18).³ Likewise, Shock

---

² My conclusion does not mean the arbitration award is ineligible to be used as evidence. Rather, the award may be admissible as evidence "based on 'the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators,' or when 'the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record.'" *Nance*, 527 F.3d at 549 (quoting *Alexander*, 415 U.S. at 60 n.21).

³ I note that the parties grapple over two distinct, but related, employment actions: Webster's initial decision to fire Shock, and Webster's later decision to reinstate Goshe but not Shock. (*See* Doc. No. 21 at 19-20; Doc. No. 24 at 10). The parties do not always distinguish between the two in their briefing. Nevertheless, because Webster agrees that Shock can carry his *prima facie* burden, I will

11

does not contest that Webster's articulated reason for firing him—engaging in a physical altercation in violation of company policy—is a legitimate, nondiscriminatory reason for that adverse employment action. (*See* Doc. No. 24 at 9). *See also, e.g. Yelder v. Norfolk S. Ry. Co.*, No. 2:18-CV-10576-TGB, 2020 WL 1083785 at *13 (E.D. Mich. March 6, 2020) (citing *Hampshire v. Henderson*, 14 F. App'x 397, 399-400 (6th Cir. 2001)) (employee admission he engaged in an altercation with a taxi driver in violation of the employee code of conduct constituted legitimate, nondiscriminatory reason for termination).

There is also no dispute that Webster's articulated reason for refusing to reinstate Shock—his substantial prior disciplinary record—qualifies as a legitimate, nondiscriminatory reason. *See, e.g.*, *Hookman v. Aaron's, Inc.*, No. 2:15-cv-2318, 2017 WL 1155925 at *8 (S.D. Ohio March 27, 2017) (plaintiff's "prior discipline for the same types of behaviors" was a legitimate, non-discriminatory reason to terminate the employee rather than impose lesser discipline). So, the viability of this claim turns on whether there is a genuine dispute of material fact as to pretext.

At the pretext stage, a court must "ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Typically, a plaintiff can do this "in three interrelated ways:" by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* at 400.

These categories of proof are neither exclusive nor rigidly applied. Instead, they are "a convenient way of marshaling evidence and focusing it on the ultimate inquiry:" whether the

---

assume, for the purposes of this opinion, that both Shock's initial termination and Webster's subsequent decision not to reverse that termination qualify as adverse employment actions.

employer "made up its stated reason to conceal intentional discrimination." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400 n.4).

To start, Shock offers little argument that Webster initially fired him because he is deaf. (*See* Doc. No. 24 at 9-10). At most, he suggests Scheiber orchestrated his termination because, two months earlier, Shock emailed Spurck to complain about a different employee, and Scheiber was copied on Spurck's emails in response. (*See id.* at 10; Doc. No. 24-4). But he "does not cite any legal authority" to support the proposition that this kind of evidence allows the inference that Scheiber acted with discriminatory animus in approving his termination. *English v. Gen. Dynamics Info. Tech. Co., Inc.*, 536 F. App'x 537, 539 (6th Cir. 2013). And he does not otherwise explain why such an inference is reasonable. (*See* Doc. No. 24 at 9-10). Further, as Shock acknowledges, his non-deaf comparator, Goshe, was originally fired along with him for spitting and pushing. (*See id.;* Doc. No. 23-1 at 47-48). So, Shock points to no evidence creating a genuine dispute over whether Webster *initially* fired him because he is deaf.

Shock aims at a second target: Webster's *later* decision to rehire Goshe but not him. Once again, Shock does not articulate his theory of pretext regarding this decision with clarity. He appears to argue that Webster's stated justification for reversing only Goshe's termination—that Shock had a history of disciplinary issues, while Goshe did not—does not hold water because Shock's 2018 "last chance letter" was modified to remove the "last chance" verbiage after Shock submitted a grievance. (*See* Doc. No. 24 at 10).

But he fails to explain how this detail could allow a reasonable juror to infer that Webster's stated justification is pretextual. An employer may treat two employees who engage in the same conduct differently if they have different disciplinary histories. *See, e.g.*, *Russell v. Univ. of Toledo*, 537 F.3d 596, 607-08 (6th Cir. 2008) (finding the plaintiff could not show pretext where she had "a long

13

history of complaints about [her] work performance and attitude, as well as multiple disciplinary actions" and her proposed comparators had no records of such discipline).

Even if Shock was not formally on a "last warning" when he spit on Goshe, the undisputed record evidence reveals a string of incidents where Shock behaved aggressively, lashed out at colleagues or supervisors, or otherwise could not regulate his anger. (*See* Doc. No. 22-10 at 1; Doc. No. 22-1 at 58; Doc. No. 21-6 at 2; Doc. No. 21-7 at 2; Doc. No. 21-8 at 3; Doc. No. 23-1 at 24-26, 73). Conversely, there is not any evidence in the record related to Goshe's disciplinary history showing he had prior incidents like Shock's, and the record evidence establishes Goshe immediately expressed remorse about the spitting and pushing incident. (*See* Doc. No. 23-1 at 47-48, 66-67).

In sum, the record shows only that Webster treated an employee with an extensive disciplinary history more harshly than an employee without a disciplinary history when both employees engaged in comparable conduct. Therefore, Shock has failed to show pretext for Webster's decision not to reinstate him.

The evidence Shock cites cannot demonstrate that Webster "made up its stated reason to conceal" disability discrimination when it fired Shock or when it later declined to reinstate him. *Tingle*, 692 F.3d at 530 (quoting *Chen*, 580 F.3d at 400 n.4). Because Shock has failed to carry his burden as to pretext, I grant Webster summary judgment on Shock's disparate treatment disability discrimination claim.

### C. RETALIATION CLAIM

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Because Shock does not purport to offer direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework also applies to his

14

retaliation claim. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014); (*see* Doc. No. 24 at 11-12).

"The plaintiff bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* If he does so, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Williams*, 847 F.3d at 396 (internal citation omitted). Then, "[t]he plaintiff must then show that the reason given by the employer was actually a pretext designed to mask retaliation." *Id.*

Webster focuses on the prima facie case, arguing Shock did not engage in protected activity under the ADA because he was terminated before he requested an interpreter or, alternately, that there was no causal connection between his termination and any protected activity. (*See* Doc. No. 21 at 24). Shock argues the short temporal gap between his request for an interpreter and his termination is enough for his retaliation claim to survive summary judgment. (Doc. No. 24 at 13).[4]

Shock's retaliation claim fails because he cannot show causation. The parties agree Shock asked for an interpreter during the termination meeting, which occurred after Webster had already decided to fire him. (*See* Doc. No. 21 at 24; Doc. No. 24 at 3, 12; Doc. No. 22-1 at 82-83). Even if a post-termination request for an interpreter can be protected activity under the ADA, protected

---

[4] Shock's briefing also refers to "notes of complaints of discrimination by a co-worker" he had forwarded to Spurck "in early June of 2020 . . . which led to his conducting meetings about issues pertaining to the effect of Mr. Shock's disability on his behavior in light of covid." (Doc. No. 24 at 12). But he does not argue these complaints were protected activity or that Webster retaliated against him for making them. (*See id.*). Shock identifies only one purported protected activity: his request for an interpreter. (*See id.*). In addition, Shock argues only that his initial termination was retaliatory. (*See id.* at 12-13). So I confine my analysis to the sole legal theory Shock advances regarding his retaliation claim: that Webster fired him because he requested an interpreter at his termination meeting.

15

activity cannot cause adverse action that "predates [the] alleged protected activity." *Williams v. Zurz*, 503 F. App'x 367, 373 (6th Cir. 2012); *see also Stewart v. Esper*, 815 F. App'x 8, 21 (6th Cir. 2020) (plaintiff could not show causal connection where alleged adverse actions "were part of an ongoing pattern that predated" the protected activity). Because Shock cannot show his request for an interpreter caused his termination, I grant Webster summary judgment on Shock's retaliation claim.

### D. FAILURE TO ACCOMMODATE CLAIM

Under the ADA, an employer must make "reasonable accommodations to known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless it can prove that such an accommodation would impose an "undue hardship" on the business. 42 U.S.C. § 12112(b)(5)(A). To succeed on a failure-to-accommodate claim, an employee must show (1) they are disabled, (2) the employer knew of their disability, (3) they are otherwise qualified for their position with or without an accommodation, and (4) they requested an accommodation that the employer denied. *Blanchet v. Charter Comms., LLC*, 27 F.4th 1221, 1227-28 (6th Cir. 2022). Then, the burden shifts to the employer to show "that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the company." *Id.* at 1228 (internal citation and quotation marks omitted).

Webster argues "Plaintiff's request for a[n] ASL interpreter after he had already been fired did not impose any obligations on Webster under the ADA." (Doc. No. 21 at 21). In the alternative, it argues that even if the ADA's reasonable accommodation provision applies to the entire termination meeting, it was not required to provide an interpreter because communication during a termination meeting is not an essential job function. (*See id.* at 22). Further in the alternative, Webster argues it provided Shock with a reasonable alternative accommodation: handwritten notes. (*See id.* at 23).

16

In response, Shock asserts Webster ought to have provided him an interpreter during his termination meeting, just as it had done for certain previous workplace meetings. (*See* Doc. No. 24 at 11). Shock also contends "there is a genuine issue of material fact here as to whether the written communication as a reasonable accommodation enabled Mr. Shock to effectively communicate regarding the incident such as to prevent his termination." (Doc. No. 24 at 11). He does not cite to the record to support any portion of his failure-to-accommodate argument. (*See id.*).

Based on the undisputed record evidence, I agree that Webster did not have an obligation under the ADA to accommodate Shock's request for an interpreter after it decided to terminate him. I need not and do not reach Webster's other arguments.

*Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729 (6th Cir. 2015), guides the analysis here. In *Yarberry*, an employee with bipolar disorder experiencing a manic episode violated his employer's conduct policy when he entered the store where he worked after hours and engaged in erratic behavior. *See* 625 F. App'x at 732-33. After being terminated, the employee proposed a leave of absence to seek treatment and asked to be reinstated, requests the employer rejected. *See id.* at 733.

The Sixth Circuit concluded that even if an employee's disability contributes to the misconduct in question, "[i]f the appropriate disciplinary action is termination, the ADA would not require further discussion about the employee's disability or request for reasonable accommodation." *Id.* at 742 (internal citation and quotation marks omitted). It explained that the "timing of a request" for an accommodation is "crucial:" because the employee "had already committed the misconduct . . . cited as the reason for his termination," the employer "was not obligated to rescind [the] termination or engage in further discussion of his requests for accommodation." *Id.* This is true even if the employer "would have been obliged to try to accommodate him" if his request had been "timely." *Id.*

17

This reasoning applies to the events giving rise to Shock's termination. Shock concedes he spit on Goshe and then pushed him. (*See* Doc. No. 24 at 3). He does not contest this behavior violated Webster's employee code of conduct. (*See id.*). He requested an interpreter during the meeting at which Webster informed him he was being terminated. (*See* Doc. No. 22-1 at 55; Doc. No. 22-8 at 1; Doc. No. 21-13 at 4). And beyond speculating that the presence of an interpreter might have "cleared up" his misconduct, Shock provides no evidence or argument to rebut the conclusion that "the appropriate disciplinary action [was] termination" in his case. *Yarberry*, 625 F. App'x at 742. *See also K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (granting summary judgment because the nonmoving party failed to "identify record evidence" to support its argument and instead relied on "speculation").

Once Webster decided to fire Shock because of the misconduct to which he admitted, Webster "was not obligated to rescind [his] termination or engage in further discussion of his requests for accommodation." 625 F. App'x at 742; *accord Payton v. Jewel Food Stores, Inc.*, 120 F. Supp. 3d 794, 800-01 (N.D. Ill. 2015) (employer was not required to provide an interpreter for a deaf employee at a termination meeting where the employee had committed terminable misconduct before requesting an interpreter). Because Webster had no duty to accommodate Shock at the time he requested an interpreter, I grant Webster summary judgment on Shock's failure to accommodate claim.

## V. Conclusion

For the reasons explained above, I grant Webster's motion for summary judgment on all of Shock's claims. (Doc. No. 21).

So Ordered.

                                              s/ Jeffrey J. Helmick
                                              United States District Judge